UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
JAMIE RIO MARTINEZ,

                     Plaintiff,                   Case No.:_____

-against-

ACCELERANT MEDIA, LLC,
ACCELERANT MEDIA CORPORATION,
CHET STOJANOVICH PRODUCTIONS, LLC,   **COMPLAINT**
CHET STOJANOVICH, and MATT HARPER

                     Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

       Plaintiff, JAMIE RIO MARTINEZ brings this Complaint against Defendants, ACCELERANT MEDIA, LLC ("Accelerant LLC"), ACCELERANT MEDIA CORPORATION ("Accelerant Corp."), CHET STOJANOVICH PRODUCTIONS, LLC ("Chet Productions"), CHET STOJANOVICH, individually, and MATT HARPER, individually, (collectively "Defendants") and states as follows:

## INTRODUCTION

       1.     Plaintiff Jamie Martinez brings the following claims for breach of contract, breach of the implied covenant of good faith and fair dealing, fraud, fraud in the inducement, and unjust enrichment.

       2.     Defendants engaged in a fraudulent Ponzi scheme whereby Defendant Stojanovich pretended to be developing an innovative technology to "passively" display 3-D video to consumers without requiring the use of specialized 3-D glasses or equipment by the consumer. Defendants also promoted proprietary encoding technology that would enable them to deliver high quality content with reduced bandwidth needs, which would enable widespread streaming of Defendants' passive 3-D video. Defendants dangled the promise of this technology to induce Plaintiff to invest hundreds of thousands of dollars into their scheme.

3. Defendants lied at every stage of the scheme. From the beginning, Defendants had no intention to and did not pursue the development of this technology. Defendants never developed the encoding technology to enable streaming of high quality 3-D content with low bandwidth uses and never had any intention to develop such technology. And after Plaintiff made substantial investments with Defendants, he learned that Defendants' supposed innovative "passive 3-D" technology was included in low cost televisions sold by Wal-Mart.

4. Instead of using Plaintiff's investments for legitimate purposes, Defendants used a substantial portion of the investments to pay off a previous investor who Defendants had defrauded in the same scheme, which relieved Defendant Stojanovich of substantial personal liability.

5. After Plaintiff learned of Defendants' fraudulent scheme, Defendant Stojanovich stopped communicating with Plaintiff. To date, Plaintiff has suffered substantial losses due to Defendants fraudulent investment scheme.

**PARTIES**

6. Plaintiff Jamie Rio Martinez is a natural person and resident of Monrovia, California.

7. Defendant Accelerant Media, LLC, is a limited liability corporation incorporated in the State of New York, County of New York, which may be served by service on its registered agent at United States Corporation Agents, Inc., at 7014 13th Avenue, Suite 202, Brooklyn, NY 11228. Accelerant Media, LLC has its principal place of business in New York.

8. Defendant Accelerant Media Corporation is a corporation incorporated in the State of Delaware, which may be served by service on its registered agent at United States Corporation Agents, Inc., at 221 N Broad Street, Suite 3A, Middletown, DE 19709. Accelerant Media Corporation has its principal place of business in New York.

9. Defendant Chet Stojanovich Productions, LLC is a limited liability company incorporated in the state of New York, which may be served by service on its Chief Executive

Officer Chet Stojanovich, at 325 North End Avenue #23C, New York, NY 10282-1035.

10. Defendant Chet Stojanovich is a natural person and maintains as residence at 325 North End Avenue #23C, New York, NY 10282-1035.

11. Defendant Matt Harper is a natural person and resident of California.

## PIERCING THE CORPORATE VEIL

12. Defendant Stojanovich is the Chief Executive Officer of Defendants Accelerant LLC, Accelerant Corporation, and Chet Productions.

13. Defendant Stojanovich transfers money between these corporations, comingles their finances and, at times, uses the funds of the corporations for his own personal use and benefit.

14. Defendant Stojanovich regularly fails to observe business formalities with regards to his management and operation of the three corporations.

15. Defendant Stojanovich abused the corporate form to perpetrate a fraud on Plaintiff and other members of the public, as detailed further below.

16. Defendants Accelerant LLC, Accelerant Corporation, and Chet Productions are alter egos of Defendant Stojanovich and of each other. Defendant Stojanovich is personally liable for the debts of Defendants Accelerant LLC, Accelerant Corporation, and Chet Productions under a veil piercing or alter ego theory, and the three business entities are likewise liable for each others' debts to Plaintiff under a veil piercing or alter ego theory.

## JURISDICTION & VENUE

17. The court has subject matter jurisdiction for federal question jurisdiction under 28 U.S.C. § 1331. Plaintiff asserts a civil RICO claim against Defendants under 18 U.S.C. § 1964, which raises a question of federal law. The court also has supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367 because those claims arise from the same facts as and are so related to Plaintiff's civil RICO claims as to form part of the same case or controversy. This action arises out a continuous racketeering organization that operated an ongoing Ponzi scheme;

all claims asserted arise from that nexus of activity.

18. The Court has personal jurisdiction over Defendants Accelerant LLC, Accelerant Corp., Chet Productions, and Stojanovich because they are residents of New York and subject to general personal jurisdiction there. The Court also has personal jurisdiction over these Defendants because they carried out their fraudulent scheme in New York and took various actions giving rise to liability in New York, including entering some of the agreements at issue in this matter.

19. The Court has personal jurisdiction over Defendant Harper because he entered a partnership with Defendant Stojanovich in New York, had extensive business dealings with the other Defendants in New York, directed Plaintiff to do business with the New York Defendants, and received payments from Plaintiff and sent those payments to New York. Defendant Harper participated in the fraudulent scheme that was primarily carried out in New York.

20. Venue is proper in this district under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to Plaintiff's claims, including the entering of relevant agreements at issue in this case, occurred in this district.

## FACTS

**A.   Defendants Promote Their Allegedly Innovative Technology**

21. Defendant Accelerant LLC is a subsidiary of Chet Productions.

22. In late 2015, Defendant Harper began working with Defendant Stojanovich at Defendant Accelerant LLC.

23. In early 2016, Defendant Accelerant LLC began touting a proprietary technology that purported to allow users to "passively" view 3-D content without a 3-D glasses. The Family Office Club, a company that connects those looking for investments to family office investors, presented Accelerant's passive 3-D technology at the 2016 Family Office Summit.

24. Defendants Stojanovich, Harper, and Accelerant LLC also promoted a proprietary encoding technology that would enable the encoding of high-quality video with low bandwidth

usage. The high quality and reduced bandwidth would supposedly enable widespread streaming of Defendants' passive 3-D content.

**B.      Defendants Snare Their First Victim**

25.     On March 10, 2016, Defendant Stojanovich entered into a bridge loan agreement, in his individual capacity, with afterThought Inc. ("afterThought"), a Nevada company. Ammar Kubba, a Nevada resident, is the CEO of afterThought. The purpose of the bridge loan was to finance the development of a business plan to enable Defendant Stojanovich to secure Series A funding for Accelerant Corporation.

26.     afterThought loaned Defendant Stojanovich $150,000 for a term of 60 days. Upon maturity, Defendant Stojanovich agreed to pay afterThought the principal of $150,000 plus 15 basis points on the principal, up to $22,500. The bridge loan was to mature on May 10, 2016.

27.     Defendant Stojanovich granted afterThought a security interest in a certificate of deposit held at City National Bank for his benefit.

28.     Defendants Stojanovich and Harper put together a marketing package showing designs for a purported mobile Post-Production Studio Homebase, which was to be a custom designed luxury bus. This marketing package was meant to give the false impression that Defendants had a real intention of pursuing the business plan they were pitching to targets of their scam. Upon information and belief, this mobile Homebase was never actually built.

**C.      Defendants Repeatedly Fail to Meet Their Obligations to afterThought**

29.     On May 9, 2016, Defendant Stojanovich and afterThought agreed to a 60-day extension of the bridge loan. But Defendant Stojanovich still was not able to meet this extended deadline.

30.     On July 15, 2016, afterThought entered a new loan agreement with Defendants Stojanovich and Accelerant Corporation. Defendant Chet Productions was the guarantor for the loan. afterThought loaned an additional $200,000 to Defendants Stojanovich and Accelerant

Corporation and merged it with the original loan for a total loan of $350,000. The purpose of this additional loan was, again, to complete the business plan for Accelerant Corporation and secure Series A funding.

31. Upon information and belief, Defendants never secured Series A funding.

32. On January 5, 2017, Defendants Chet Productions and Accelerant Corporation entered an early buyout agreement with afterThought. Defendant Accelerant Corporation agreed to make two payments to afterThought: (1) $172,500 by January 11, 2017, and (2) $402,500 by June 16, 2017. afterThought gave up its security interest in the collateral that Defendants had provided for the previous loans. Defendants also agreed that if they did not make the second payment in time, Defendant Stojanovich would be personally liable for the amount owed.

**D.    Defendants Search for a New Victim to Pay for the 2017 NAB Show**

33. In 2017, Defendants were attempting to procure a booth at the 2017 National Association of Broadcasters Show ("NAB Show"), an annual trade show for media, entertainment, and technology, which was to be held from April 22–27, 2017. But Defendants did not have sufficient funds to pay for all the associated expenses.

34. In early April, Christy Teichmann, who had been retained by Defendants to help them prepare for the NAB Show, put Plaintiff in contact with Defendant Harper, who presented himself at this time as the Chief Business Development Officer for Accelerant LLC.

35. Defendant Harper shared Defendants' business plan with Plaintiff and touted Defendants' supposed innovative passive 3-D technology, proprietary encoding technology, and plans for widespread streaming of passive 3-D content to Plaintiff to convince Plaintiff to invest in Accelerant Corporation.

36. This business plan was a deception. Defendants did not have the technology they claimed to have to enable widespread streaming of passive 3-D content, knew they did not have that technology, and did not have the means or intention of developing that technology.

6

37. On April 17, 2017, in reliance on Defendants' business plan and representations, Plaintiff entered a Convertible Investment Agreement with Defendant Accelerant Corporation. Plaintiff invested $150,000 into Defendant Accelerant Corporation. Defendant Accelerant Corporation promised Plaintiff a share of its gross revenue during the investment term of 18 months as consideration for the investment. Plaintiff also had the option to convert the $150,000 investment into equity shares or other financial considerations identical to those granted to Series A investors or to receive three payments of $150,000.

38. Defendant Accelerant Corporation represented that the purpose of this funding was to pay for the NAB Show and related marketing and operating expenses.

39. Accelerant Corporation paid $3,000 to Christy Teichmann for introducing Plaintiff as a corporate investor to Accelerant Corporation.

40. On April 19, 2017, Plaintiff sent a wire transfer of $150,000 to Defendant Harper for Accelerant Corporation. Of that $150,000 investment, $75,000 was later paid directly to Defendant Chet Stojanovich. The remainder allegedly went to cover various expenses associated with the NAB show.

41. Despite Plaintiff's investment, Defendants did not set up a booth or display at the NAB Show, allegedly due to technical problems. Instead, Defendants presented their technology, now dubbed "ChetVision," from a room in MGM Suites.

E. **Defendants Continue to Squeeze More Money from Plaintiff**

42. After the NAB Show Defendants faced the upcoming payment of $402,500 by June 16, 2017, to afterThought pursuant to the Early Buyout Agreement. Unsurprisingly, Defendants failed to make this payment in time. Defendants did not disclose this to Plaintiff.

43. On July 25, 2017, Plaintiff and Defendants entered an Accelerant Investment Agreement. Plaintiff provided real estate properties worth $1.2 million to Defendants as collateral to secure a capital round of $850,000. In addition, Plaintiff rolled the $150,000 invested in the

7

Convertible Loan Agreement into this new investment agreement. In consideration, Plaintiff received the lead investment position and a greater share of the gross revenue.

44. On September 8, 2017, Defendants Chet Productions, Accelerant Corporation, and Stojanovich entered a settlement agreement with afterThought. Defendants admitted their failure to pay afterThought the amount owed, affirmed that they owed the $402,500 payment plus interest and attorneys' fees, and in exchange for forbearance from afterThought, agreed to enter Confessions of Judgment for the amount owed. afterThought agreed to forbear filing legal actions against Defendants until October 6, 2017.

45. On October 7, 2017, after failing to pay afterThought during the forbearance period, Defendants again turned to Plaintiff for money. Plaintiff and Defendants Accelerant Corporation and Stojanovich entered an Accelerant Investment Agreement. Plaintiff agreed to provide its real estate property at 1801 South Palomo, Palm Springs, California 92264 ("1801 Property) as collateral to secure a new capital round.

46. Plaintiff took out a loan on the 1801 Property and, on November 4, 2017, transferred over $300,000 to Accelerant LLC. Accelerant Corporation planned to use the funds provided by Plaintiff to pay out afterThought.

47. On November 8, 2017, Accelerant Corporation paid $200,000 to afterThought. This $200,000 came from Plaintiff's investment in Accelerant Corporation.

48. Plaintiff also transferred additional funds to Defendants based on false representations that these investments would be used to further Defendants' purported business plan. Upon information and belief, these funds were not used to further Defendants' purported business and instead were used for the personal benefit of Defendants Stojanovich and Harper.

F. **Defendants' Scam is Revealed**

49. On November 26, 2017, Defendant Harper informed Plaintiff that Defendants' highly touted passive 3-D technology, dubbed ChetVision, was available in a television from

WalMart. Defendant Harper confirmed that the Defendants' purported technology and business plan was a scam. Defendant Harper pretended to have no prior awareness or involvement in the scam by stating that he had also been screwed by Defendant Stojanovich.

50. After the scam was revealed, Defendant Stojanovich completely stopped communicating with Plaintiff.

51. In February 28, 2018, the FBI opened cases against Defendants Accelerant Corporation, Accelerant LLC, Stojanovoich, and Harper.

52. Defendant Harper apologized and agreed to pay Plaintiff $60,000 to mitigate some of Plaintiff's damages. At the same time, Defendant Harper began soliciting Plaintiff to invest in yet another scheme, this time purportedly with an Isle of Mann based media development entity. Plaintiff did not do any further business with Defendant Harper.

53. In total, Plaintiff transmitted at least $475,000 to Defendants' for their fraudulent scheme. In addition, Plaintiff has further incurred costs of $19,077 in wire fees and refinance fees in support of Defendants' fraudulent scheme. Plaintiff has further paid $94,884.76 in mortgage payments, lease payments, and HOA fees in support of Defendants' fraudulent scheme. Plaintiff has thus lost at least $588,961.76 to Defendants' fraudulent scheme.

**G.    Defendants Stojanovich Reemerges in Connection with Scheme to Defraud Investors**

54. On June 10, 2020, a civil complaint was filed in the District Court for the Southern District of New York against multiple persons, including Defendant Stojanovich in Case No. 1:20-cv-04448, captioned *Holmes, et al. v. Chet Mining Co., LLC, et al*. ("Holmes Complaint")

55. The Holmes Complaint alleged that Defendant Stojanovich continued to engage in a new scheme to defraud investors, after his Ponzi scheme against Plaintiff in this case was revealed. Specifically, the Holmes Complaint alleged that beginning in 2019, Plaintiff induced various investors to invest with Defendant Stojanovich and various entities controlled by Defendant Stojanovich in Bitcoin mining equipment and hosting services that Defendant

Stojanovich had no ability or intention to provide.

## CLAIMS FOR RELIEF

### Count One: Civil RICO Violations (18 U.S.C. § 1964)

56. Defendants made the following false representations in furtherance of their Ponzi scheme:

   a. Defendant represented that they were developing an innovative technology to "passively" display 3-D video to consumers without requiring the use of specialized 3-D glasses or equipment by the consumer;

   b. Defendants represented that they had proprietary encoding technology that would enable them to deliver high quality content with reduced bandwidth needs, which would enable widespread streaming of Defendants' passive 3-D video;

   c. Defendants represented that they intended to engage in widespread streaming of video using their passive 3-D technology

57. Defendants knew at the time that they made these representations that they were false. Defendants intended for Plaintiff and other persons to whom the false representations were made to rely on said false representations.

58. Defendants transmitted their false representations in multiple electronic formats, including through email communications.

59. Multiple persons, including Plaintiff, believed and relied on Defendants' false representations to do invest with Defendants. In reliance on Defendants' false representations, Plaintiff entered contracts with and transmitted money to Defendants on multiple occasions by wire transfer. This caused injury to Plaintiff's property.

60. Defendants thereby committed multiple acts of wire fraud.

61. Defendants acted in concert to effectuate the fraud. Defendants Stojanovich and Harper acted as the masterminds behind the fraud. Accelerant LLC acted as the holder of the

supposedly innovative technology and pretended to be doing the work in which Plaintiff and others were supposedly investing. Accelerant Corporation and Chet Productions acted as the business entities to contract with and receive money from Plaintiff and other victims. Collectively, these entities constitute an enterprise.

62. Defendants committed multiple predicate acts of wire fraud. These multiple predicate acts of wire fraud were related to each other and in furtherance of Defendants' Ponzi scheme to defraud plaintiffs and other investors.

63. By its nature, Defendants' Ponzi scheme posed a threat of continuous criminal activity as the Ponzi scheme required Defendants to continue to defraud new investors to pay off older investors.

64. Defendant Stojanovich also poses a threat of continuous criminal activity because he, along with multiple entities he controls, has engaged in a variety of schemes to defraud different groups of investors in different industries over a period of several years.

65. In addition, Defendants' conduct with respect to the Ponzi scheme at issue in this case constituted a closed-ended pattern of racketeering because Defendants engaged in multiple predicate acts of wire fraud over a substantial period of time of at least twenty months.

66. Defendants' multiple, related predicate acts constitute a pattern of racketeering activity.

67. Defendants' actions proximately caused harm to Plaintiff of at least $588,961.76.

68. Defendants received income from a pattern of continuing racketeering activity and have used such income in the operation of, maintenance of, and conduction of the affairs of an enterprise engaged in activities that affect interstate commerce.

69. Defendants are jointly and severally liable to Plaintiff for damages of at least $588,961.76, treble damages pursuant to 18 U.S.C § 1964(c), attorneys' fees, and interest.

### Count Two: Breach of Contract

70. Plaintiff and Defendants entered multiple agreements, including a Convertible Loan Agreement and two Investment Agreements.

71. The agreements require that Plaintiff provide money and collateral to Defendants. Plaintiff fulfilled its obligations under all agreements.

72. The agreements require that Defendants take responsibility for all payments related to the collateral provided by Plaintiff and to pay Plaintiff a percentage of Defendants' gross revenue. Defendant did not perform either of these obligations and thus materially breached its agreements with Plaintiff.

73. Defendants are jointly and severally liable to Plaintiff for damages of at least $588,961.76.

### Count Three: Breach of the Implied Covenant of Good Faith and Fair Dealing

74. Plaintiff and Defendants entered multiple agreements, including a Convertible Loan Agreement and two Investment Agreements. The purported purpose of these agreements was to enable Defendants to pursue a business plan for widespread streaming of passive 3-D content using Defendants' proprietary technology.

75. The agreements require that Plaintiff provide money and collateral to Defendants. Plaintiff fulfilled its obligations under all agreements.

76. The agreements require that Defendants pay Plaintiff a percentage of the gross revenue from their proposed business.

77. The agreements thus impose an implied duty on Defendants to pursue the goals of the business plan and to use the money received from Plaintiff to reasonably further their business plan. Defendants failed to do so and instead wasted Plaintiff's investment. Because of this, Defendants had no gross revenue from which to pay Plaintiff.

78. Defendant's failure to reasonably pursue the business plan they had pitched to Plaintiff caused Defendants to have no gross revenue and thus harmed Plaintiff.

79. Defendants breached their duty of good faith and fair dealing.

80. Defendants are jointly and severally liable to Plaintiff for damages of at least $588,961.76 and interest.

## Count Four: Fraud/Fraudulent Inducement

81. While pitching an investment opportunity to Plaintiff, Defendants made multiple representations including the following: (1) Defendants had developed an innovative technology that allowed viewers to passively watch 3-D content; (2) Defendants had propriety encoding technology that allowed for encoding high quality content with low bandwidth requirements; and (3) Defendants were using these technologies to pursue a plan for widespread streaming of passive 3-D content.

82. These representations were false, and Defendants knew they were false at the time they made them. Defendants passive 3-D technology was not innovative and was available in low cost, mass produced televisions within a year. Defendants proprietary encoding technology did not work as Defendants claimed. Defendants lacked the technology to enable streaming of passive 3-D technology and Defendants had no intention of developing this technology.

83. Plaintiff did not know these representations were false and reasonably relied on these representations to invest in Defendants' scheme. Defendants knew and intended that Plaintiff would rely on these representations.

84. As a result of Plaintiff's reasonable reliance on Defendants' misrepresentations, Plaintiff suffered an injury.

85. Defendants are jointly and severally liable to Plaintiff for at least $588,961.76, punitive damages, and interest.

## Count Five: Unjust Enrichment

86. While pitching an investment opportunity to Plaintiff, Defendants made multiple representations including the following: (1) Defendants had developed an innovative technology that allowed viewers to passively watch 3-D content; (2) Defendants had propriety encoding technology that allowed for encoding high quality content with low bandwidth requirements; and (3) Defendants were using these technologies to pursue a plan for widespread streaming of passive 3-D content.

87. These representations were false and Defendants knew they were false at the time they made them. Defendants passive 3-D technology was not innovative and was available in low cost, mass produced televisions within a year. Defendants proprietary encoding technology did not work as Defendants claimed. Defendants lacked the technology to enable streaming of passive 3-D technology and Defendants had no intention of developing this technology.

88. Plaintiff did not know these representations were false and reasonably relied on these representations to invest in Defendants' scheme. Defendants knew and intended that Plaintiff would rely on these representations.

89. As a result of Plaintiff's reasonable reliance on Defendants' misrepresentations, Plaintiff transmitted money to Defendants as investments in their fraudulent scheme. Defendants were thus able to enrich themselves at Plaintiff's expense.

90. Due to the fraudulent conduct underlying Defendants' scheme, it is against equity and good conscience to allow Defendants to retain the money Plaintiff now tries to recover.

91. Defendants are jointly and severally liable to Plaintiff for at least $588,961.76, punitive damages, and interest.

**WHEREFORE**, Plaintiff demands judgment against Defendants, jointly and severally, as follows:

1. An award of compensatory and/or restitutionary damages of at least $588,961.76;

    2.    Treble damages pursuant to 18 U.S.C § 1964(c);

    3.    Attorneys' fees pursuant to 18 U.S.C. § 1964(c);

    4.    Punitive damages in whatever amount is justified;

    5.    Pre- and post-judgment interest in the highest amount authorized;

    6.    Costs of court; and

    7.    All other relief, both general and special, in law or in equity, to which Plaintiff may be entitled.

Dated: New York, New York
November 9, 2020

Respectfully Submitted,

**DIAMOND MCCARTHY LLP**

By: _____
Richard I. Janvey
Ryan M. Lapine
295 Madison Avenue, 11th Floor
New York, New York 10017
Tel.: (212) 430-5400
*rjanvey@diamondmccarthy.com*

333 South Hope Street, Suite 4050
Los Angeles, California 90071
Tel.: (424) 278-2323
*ryan.lapine@diamondmccarthy.com*
*(pending forthcoming pro hac vice application)*

***Counsel for Plaintiff Jamie Rio Martinez***

15